IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SERENA BEACHLEY,

   Plaintiff

v.     CIVIL NO. JKB-10-1774

PNC BANK, NATIONAL ASSOCIATION,

   Defendant

# MEMORANDUM

Plaintiff Serena Beachley sued PNC Bank because PNC allegedly reported inaccurate information about Beachley's credit history to credit reporting agencies ("CRAs"), which, in turn, reported it to credit grantors who either denied her credit or allegedly charged her a higher rate of interest for credit that was granted. (Compl., ECF No. 2.) In a poorly drafted complaint that placed all causes of action together into one count, Beachley rested her claim of damages on the following bases: (1) FCRA, 15 U.S.C. § 1681s-2(b); (2) defamation; (3) invasion of privacy; (4) violation of Maryland Fair Credit Reporting Act, Md. Code Ann., Com. Law § 14-1201 *et seq.*; and (5) "[PNC] failed in its duty to prevent foreseeable injury to plaintiff." PNC has moved for summary judgment (ECF No. 30), which the Court has considered in conjunction with Beachley's opposition (ECF No. 31) and PNC's reply (ECF No. 37). No hearing is necessary. Local Rule 105.6. The motion will be granted.

*I. Standard for Summary Judgment*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to

current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Rule 56(c)(4).

## II. Background

The parties do not dispute that Beachley, around 2000, took out an installment loan with her then-husband, Joseph Beachley, to purchase a recreational vehicle, specifically, a camper. The couple separated and Beachley filed for Chapter 7 bankruptcy. The court granted her a discharge of her debts, including her responsibility for the camper loan. Joseph Beachley kept the camper and kept making payments on the loan, although not always on time. The original loan was with Farmers & Mechanics Bank. In October 2003, Farmers & Mechanics merged into Fredericktown-Mercantile Bankshares, which, in September 2007, merged into PNC. The Farmers & Mechanics account remained on Beachley's credit record after the mergers, as did a second trade line, albeit for the same account, for Fredericktown-Mercantile Bankshares. A third

2

trade line, for the same account, was reported by PNC to CRAs. At various times after the bankruptcy discharge, Farmers & Mechanics and, later, PNC tried to collect from Beachley on the camper loan.

In mid-2008, Beachley purchased a car, but was charged a higher rate of interest because of derogatory information on her credit report. It is unknown what lower rate of interest she would have qualified for had her credit report not had derogatory information. Reportedly, she was told the derogatory information was what PNC reported regarding the camper account.

In July 2008, she contacted PNC to complain about how it was reporting the account to CRAs. PNC investigated and wrote her a letter indicating that it would henceforth report the account as having been included in her bankruptcy. In September 2008, she tried to refinance a mortgage but was denied credit because of derogatory information in her credit file. She lodged disputes with two CRAs, Equifax and TransUnion, in late September 2008. She has claimed in this lawsuit that, despite her efforts to correct the information in her credit report, PNC has continued to report falsely on her regarding the camper account and has caused her both economic and noneconomic damages.

## III. Analysis

### A. Fair Credit Reporting Act

Beachley's primary cause of action is based on alleged violations by PNC of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(b). That section provides as follows:

(1) In general

After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall--

    (A) conduct an investigation with respect to the disputed information;

3

(B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;

(C) report the results of the investigation to the consumer reporting agency;

(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and

(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly--

    (i) modify that item of information;

    (ii) delete that item of information; or

    (iii) permanently block the reporting of that item of information.

(2) Deadline

A person shall complete all investigations, reviews, and reports required under paragraph (1) regarding information provided by the person to a consumer reporting agency, before the expiration of the period under section 1681i(a)(1) of this title within which the consumer reporting agency is required to complete actions required by that section regarding that information.

In summary, this subsection can only be the basis for liability when a furnisher of information has failed in its duties (1) to investigate with respect to the disputed information, (2) to review all relevant information provided by the CRA, (3) to report the results of its investigation to the CRA, (4) if the investigation shows the disputed information is incomplete or inaccurate, to report those results to all other CRAs to which it furnished the original information, or (5) if the disputed information is incomplete or inaccurate or cannot be verified, either to (a) modify it, (b) delete it, or (c) permanently block reporting of it. These duties must be completed within 30 days. PNC is not disputed to be a furnisher of information to CRAs.

PNC contends Beachley has not provided any evidence that PNC violated the FCRA by failing to fulfill its statutory duties. PNC further contends the evidence shows it complied with all of its duties under the FCRA.

Beachley disputed information with both Equifax and TransUnion in September 2008. In regard to her dispute with Equifax, PNC received the dispute notice on September 25 or 26, 2008. (Def.'s Mot. Summ. J. Ex. G, ECF No. 30.) Beachley disputed the account information for the Farmers & Mechanics trade line because her credit file should have shown the account as having been included in her bankruptcy. (*Id.*) On September 29, 2008, PNC directed Equifax to delete the account. (*Id.*)

As for her dispute with TransUnion, PNC received the dispute on September 26, 2008. (*Id.* Ex. H.) Beachley disputed the Fredericktown-Mercantile Bankshares account information on the basis that she was not liable for the account. (*Id.*) On September 27, 2008, TransUnion reported back to Beachley that the account was revised to show that she had disputed the account. (*Id.*) These are the only disputes Beachley has made with CRAs, according to the evidence before the Court.

PNC responded promptly to the consumer disputes of which it was notified by the CRAs. After Beachley's claim that the Farmers & Mechanics account was included in her bankruptcy was verified, PNC directed Equifax to delete the trade line. As for the Fredericktown-Mercantile Bankshares trade line, Beachley only disputed ownership of the account in her complaint to TransUnion. The account ownership was verified, and PNC directed TransUnion to show that the account was disputed.

No doubt, Beachley believes that PNC should have recognized that she was the same person on the two accounts, that the two accounts should have been regarded as the same account, and that, despite the recorded nature of her dispute with TransUnion about ownership of

the account, the Fredericktown-Mercantile Bankshares trade line should have also been deleted. The historical information pertaining to account ownership, however, is not inconsistent with discharge of that account in bankruptcy. In a perfect world, perhaps, a furnisher of credit information should understand that a dispute as to responsibility for the account is the same as a dispute that the account was discharged in bankruptcy, but the FCRA does not require perfection, only a reasonable response. PNC's responses to the September 2008 disputes with TransUnion and Equifax were reasonable based on the information the CRAs gave to PNC.

Beachley tries to show that PNC violated the FCRA in two other ways. First, in July 2008, she disputed directly with PNC the information reported on her PNC account. PNC's response was to investigate and to inform Beachley that it was modifying how it was reporting the account to show it as being included in Beachley's bankruptcy. (*Id.* Ex. F.) Whatever shortcomings Beachley attributes to PNC in regard to that July 2008 direct dispute, they do not violate the FCRA. Section 1681s-2(b) does not address the situation in which a consumer directly disputes account information with the credit grantor. Consequently, this is not a basis for liability under the FCRA.

Second, she indicates that incorrect information reappeared on her credit report in relation to the third iteration of the account as a PNC account. (Pl.'s Opp. 12, ECF No. 31.) She has never, however, lodged a dispute with a CRA about the PNC account information. No duty by PNC under section 1681s-2(b) arises until the consumer lodges such a dispute.

Beachley has made a bare statement in her opposition to PNC's motion to the effect that PNC did not notify other CRAs of the outcome of its investigation, but has not supported that statement with any evidence. Her assertion, with nothing more, is not sufficient to survive a motion for summary judgment. Beachley has failed to create a genuine dispute of material fact as to whether PNC violated the FCRA.

## B. Defamation

To the extent that Beachley asserts a common-law claim for defamation, that cause of action is preempted by the FCRA "except as to false information furnished with malice or willful intent to injure such consumer." 15 U.S.C. § 1681h(e).[1] Maryland has adopted the Supreme Court's definition of malice in the context of defamation cases. *See, e.g.*, *Capital-Gazette Newspapers, Inc. v. Stack*, 445 A.2d 1038, 1043-45 (Md. 1982). Thus, malice can be established by evidence showing the defendant made a false statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times v. Sullivan*, 376 U.S. 254, 279-80 (1964). The Maryland Court of Appeals noted the linguistic variations on the malice standard:

> Subsequent Supreme Court cases have explicated the standard of "actual malice." Thus, in *Garrison v. State of Louisiana*, 379 U.S. 64, 74, 85 S. Ct. 209, 216, 13 L.Ed.2d 125 (1964), the Supreme Court described "actual malice" as "false statements made with [a] high degree of awareness of their probable falsity." In *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S. Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), the Supreme Court stated that publishing with "serious doubts as to the truth of [the] publication ... shows reckless disregard for truth or falsity and demonstrates actual malice." In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 335 n.6, 94 S. Ct. 2997, 3004 n.6, 41 L.Ed.2d 789 (1974), the Supreme Court reiterated that "subjective awareness of probable falsity" constitutes actual malice. In *Herbert v. Lando*, 441 U.S. 153, 160, 99 S. Ct. 1635, 1640, 60 L.Ed.2d 115 (1979), the Supreme Court emphasized that actual malice requires examination of "the conduct and state of mind" of the publisher and a showing that the publisher "must know or have reason to suspect that his publication is false."
>
> In *New York Times Co.*, and its progeny, the Supreme Court not only established the "actual malice" standard, but also considered the proof necessary to support a finding of "actual malice." The existence of actual malice can be established "only on clear and convincing proof." *Gertz*, 418 U.S. at 342, 94 S. Ct. at 3008; *see also, Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 83, 88 S. Ct. 197, 199, 19 L.Ed.2d 248 (1964); *New York Times Co.*, 376 U.S. at 285–86, 84 S. Ct.

---

[1] For a discussion of the interplay between various sections of the FCRA and state law, see *Beuster v. Equifax Information Services*, 435 F. Supp. 2d 471, 474-79 (D. Md. 2006), which concludes that section 1681h(e) was intended to govern preemption of common-law claims while section 1681t(b) was intended to govern preemption of state statutory claims.

7

at 729.

"Actual malice" can be established by showing that: a defamatory statement was a calculated falsehood or lie "knowingly and deliberately published," *Garrison*, 379 U.S. at 75, 85 S. Ct. at 216; *see also, Cantrell v. Forest City Publishing Co.*, 419 U.S. 245, 252–53, 95 S. Ct. 465, 470–71, 42 L.Ed.2d 419 (1974); a defamatory statement was the product of the publisher's imagination; a defamatory statement was so inherently improbable that only a reckless person would have put it in circulation; or the publisher had obvious reasons to distrust the accuracy of the alleged defamatory statement or the reliability of the source of the statement, *St. Amant*, 390 U.S. at 732, 88 S. Ct. at 1326.

"Actual malice" cannot be established merely by showing that: the publication was erroneous, derogatory or untrue, *Gertz*, 418 U.S. at 340–41, 94 S. Ct. at 3007; *St. Amant*, 390 U.S. at 732, 88 S. Ct. at 1326; *New York Times Co.*, 376 U.S. at 281, 84 S. Ct. at 726; the publisher acted out of ill will, hatred or a desire to injure the official, *Greenbelt Cooperative Publishing Ass'n. v. Bresler*, 398 U.S. 6, 10–11, 90 S. Ct. 1537, 1540, 26 L.Ed.2d 6 (1970); *Garrison*, 379 U.S. at 73–74, 85 S. Ct. at 215; the publisher acted negligently, *Garrison*, 379 U.S. at 79, 85 S. Ct. at 218; *New York Times Co.*, 376 U.S. at 288, 84 S. Ct. at 730; the publisher acted in reliance on the unverified statement of a third party without personal knowledge of the subject matter of the defamatory statement, *St. Amant*, 390 U.S. at 732, 88 S. Ct. at 1326; or the publisher acted without undertaking the investigation that would have been made by a reasonably prudent person, *Gertz*, 418 U.S. at 332, 94 S. Ct. at 3003; *St. Amant*, 390 U.S. at 731, 88 S. Ct. at 1325; *Beckley Newspapers Corp.*, 389 U.S. at 84–85, 88 S. Ct. at 200; *New York Times Co.*, 376 U.S. at 287–88, 84 S. Ct. at 730. Moreover, malice is not established if there is evidence to show that the publisher acted on a reasonable belief that the defamatory material was "'substantially correct'" and "there was no evidence to impeach the [publisher's] good faith," *New York Times Co.*, 376 U.S. at 286, 84 S. Ct. at 729.

*Capital-Gazette*, 445 A.2d at 1043-45 (alterations in original).

"Willful intent to injure" requires a showing that PNC knowingly and intentionally committed an act in conscious disregard for Beachley's rights. *Beuster v. Equifax Information Services*, 435 F. Supp. 2d 471, 479 (D. Md. 2006) (citing *Wiggins v. Equifax Servs., Inc.*, 848 F. Supp. 213, 219 (D.D.C. 1993)). Beachley argues the definition of willfulness here also includes recklessness, citing *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 56-57 (2001). Although *Safeco* was directed at another section of the FCRA, for the sake of argument, the Court assumes reckless conduct by PNC would suffice for "willful intent to injure." Even so, Beachley does not

satisfy even the *Safeco* standard of recklessness.  As proof of malice or willful intent to injure, Beachley relies upon the evidence of her direct notification to PNC in July 2008 that her PNC account was included in her bankruptcy and the subsequent inaccuracies in reporting after PNC had directed the CRAs to include the notation about her bankruptcy on the trade line. (Pl.'s Opp. 30.)  Those later inaccuracies included the following:

1. A copy of credit report information from Equifax on November 11, 2008, showing a balance owing of $4735 on the PNC account (Pl.'s Opp. Ex. 20 (sealed));

2. A copy of credit report information from Equifax on August 20, 2009, showing the Farmers & Mechanics account included in Beachley's bankruptcy, late payment information from 2007 through 2008 on the PNC account, and a balance of $3401 on the PNC account (*id.* Ex. 21);

3. A copy of credit report information from Equifax on November 16, 2010, showing the PNC account as being paid and closed with a zero balance but with late payment information from 2007 through March 2010 (*id.* Ex. 22);

4. A copy of credit report information from Equifax on May 25, 2011, showing the PNC account with April 2010 for dates of last report, last payment, and when closed, pay status of "pays 31-69 days," balance owing of $0, and status of "paid and closed" (*id.* Ex. 27);

5. A copy of credit report information from TransUnion on September 25, 2008 (the one that triggered Beachley's consumer dispute with that CRA), showing the Farmers & Mechanics account as last updated in October 2003, balance owing of $0, status of "paid or paying as agreed," date closed October 2003, late payment information for the prior twenty-three months, and the notation, "transferred to another lender"; also showing the Fredericktown-Mercantile Bankshares account as last updated in September 2007, balance owing of $0, status of "paid or paying as agreed," date closed September 2007, late payment information for the prior forty-seven months, and the notation, "purchased by another lender"; and further showing the PNC account as last updated in August 2008, no balance owing, pay status of "unrated," and the notation, "Chapter 7 bankruptcy" (*id.* Ex. 23);

6. A copy of credit report information originating from TransUnion on March 12, 2009, showing the PNC account with date of last report January 2009, no balance owing, pay status of "unrated," and the notation, "Chapter 7 bankruptcy" (*id.* Ex. 29);

7. A copy of credit report information from TransUnion on July 2, 2009, showing the Fredericktown-Mercantile Bankshares account as verified September 2007, balance owing of $0, status of "paid or paying as agreed," date closed September 2007, late payment information for the prior forty-seven months, and the notation, "acct info disputed by consumr [sic]"; also showing the PNC account as last updated May 2009, no

9

balance owing, pay status of "unrated," and the notation, "Chapter 7 bankruptcy" (*id.* Ex. 24); and

8. A copy of credit report information from TransUnion on November 8, 2010, showing the Fredericktown-Mercantile Bankshares account with the same information from the July 2, 2009, report and showing the PNC account with the same information from the July 2, 2009, report except the date of last update was April 2010 and the date closed was April 2010 (*id.* Ex. 25).

She also relies upon the acknowledgement by PNC's corporate representative that Beachley's credit report should not have shown a balance owing on the PNC account or late payment information from the time period after the debt was discharged in bankruptcy. (*Id.* Ex. 26.) That is true. But the evidence simply does not rise to the level of malice or willful intent to injure. At most, the evidence shows the bank made errors in resupplying CRAs incomplete or inaccurate information about the account. Beachley, understandably, may have felt frustrated that the information did not accurately reflect her history.[2] However, she has failed to overcome the hurdle to a successful defamation claim.

*C. Other causes of action*

Beachley's complaint makes bare mention of three other causes of action: invasion of privacy, the Maryland Fair Credit Reporting Act, and failure in PNC's duty to prevent foreseeable injury to Beachley. The last cause of action the Court interprets to mean negligence. Beachley has presented neither evidence nor argument to support any of these claims, and they shall be considered to have been abandoned.

---

[2] The Court has observed that the various credit reports submitted in evidence show a fair amount of adverse information unrelated to PNC. Beachley's reports showed her bankruptcy, several collection items, and late payment information for other accounts.

*IV. Conclusion*

No genuine dispute of material fact exists on any issue in the case, and PNC is entitled to summary judgment as a matter of law. A separate order will be entered accordingly.

DATED this 22nd day of August, 2011.

BY THE COURT:

/s/
James K. Bredar
United States District Judge